UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────── x

JAVELIN GLOBAL COMMODITIES (UK) LTD.,

    Plaintiff,

No. 20-cv-07550

v.

JAMES H. BOOTH,

    Defendant.

──────────────────────────────── x

## ORDER DENYING PLAINTIFF'S PRE-DISCOVERY MOTION FOR SUMMARY JUDGMENT

McMahon, J.

    Plaintiff Javelin Global Commodities (UK) Ltd. ("Javelin" or "Plaintiff") brings a single breach of contract claim against James H. Booth ("Booth" or "Defendant") for breach of a written guaranty agreement (the "Guaranty"). (*See* Dkt. No. 1 ("Compl.")). Plaintiff seeks an award of damages in the amount of $3,281,487.91, plus costs and attorneys' fees due under the Guaranty.

    Plaintiff moves, prior to any discovery, for summary judgment pursuant to Fed. R. Civ. P. 56. (*See* Dkt. No. 38). The motion is opposed. (*See* Dkt. No. 46 ("Opp.")).

    For the following reasons, Plaintiff's motion for summary judgment is DENIED without prejudice to renewal after discovery.

1

# FACTUAL BACKGROUND[1]

## A. Parties and Relevant Non-Parties

Plaintiff Javelin is a United Kingdom Limited Liability company organized under the laws of England and Wales with a place of business in London. (Dkt. No. 40-1 ("Pl.'s Rule 56.1") ¶1). Javelin's business includes the sale and marketing of commodities, including coal. (*Id.* ¶2).

Defendant Booth is an individual citizen and resident of Kentucky. (Compl. ¶2). Booth was a member and officer of non-party Cambrian Coal LLC ("Cambrian"), a Kentucky LLC engaged in the mining of coal. (Pl.'s Rule 56.1 ¶3).

Non-parties Clintwood Elkhorn Mining LLC ("Clintwood") and Premier Elkhorn Coal LLC ("Premier Elkhorn") are affiliates of Cambrian.

## B. The Underlying Agreements and Guaranty

### i. *The Master Coal Purchase and Sale Agreement*

In 2018, Javelin and Cambrian entered into a "Master Coal Purchase and Sale Agreement" dated September 7, 2018 ("Master Agreement"). (*See* Pl.'s Rule 56.1 ¶4; Dkt. No. 39-2). The Master Coal Purchase Agreement set forth terms for transactions between Javelin and Cambrian for the shipment, purchase and sale of coal. (*See* Dkt. No. 39-2).

Cambrian was authorized under the Master Agreement to "designate any of its Affiliates," including specifically Clintwood and Premier Elkhorn, "as the Seller under any Confirmation." (*Id.* at § 23.1). And Clintwood and Premier Elkhorn, affiliates of Cambrian, were each listed as "Approved Sellers" under the Master Agreement. (*Id.* at Annex 2). Per the terms of the Master Agreement, Cambrian agreed that, whenever an Approved Seller executed a Confirmation, Cambrian would be "bound by the terms of such Confirmation and hereby irrevocably grants to

---

[1] Unless specifically noted otherwise, the facts contained in this section are undisputed, as drawn from the parties' Rule 56.1 statement of undisputed facts and response statement. (*See* Dkt. Nos. 40-1, 45).

2

each Approved Seller all necessary power and authority to bound Counterparty" and that "no such designation [of Approved Sellers] by [Cambrian] shall relieve [Cambrian] of its obligations [under the Master Agreement] with respect to such Confirmation." (*Id.* at § 23.1).

    ii.   *The Marketing Agreement*

The Master Agreement references Javelin's and Cambrian's entering into a separate "Marketing Agreement." Specifically, the Master Agreement states, "The Parties are entering into this Master Agreement concurrently with the Marketing Agreement (as hereinafter defined), the two agreements being complimentary of, and mutually dependent on one another, each forming part of a single, unified underlying business relationship among the Parties." (*Id.* at 3). The Marketing Agreement contains the same general language that the agreements are complimentary, mutually dependent, and form part of a single underlying business relationship among the parties. (*See* Dkt. No. 48-1).

    iii.   *The Confirmation*

Pursuant to the Master Agreement, Javelin and Cambrian entered into a purchase and sale confirmation, reference number CLI18(TP)0004 (the "Confirmation"), dated September 7, 2018. (*See* Dkt. No. 39-3). Cambrian's affiliate Clintwood was the designated Seller under this Confirmation.

The Confirmation set forth the terms for a specific "Onward Sale" transaction. (*Id.* at 8). The Confirmation explains that Javelin had entered into a separate contract with the non-party United States Steel Corporation ("USSC") for the sale and purchase of coal produced by Clintwood or its affiliates. (*Id.* at 2). Javelin entered into the contract with USSC "for the purposes of intermediating the supply of coal." (*Id.*). Clintwood, as an authorized seller for Cambrian, agreed to supply coal to Javelin "in order to fulfil" the terms of Javelin's contract with USSC.

3

The Confirmation referenced and incorporated the "Customer Contract" between Javelin and USSC for many of the "Principle Terms" of the product shipment and delivery. (*Id.* at 2-3; *see id.* at 14). Specifically, the Confirmation and Customer Contract set forth that, between May 1, 1018 and March 31, 2019, Clintwood was to sell and deliver 179,458 short tons of coal ratably to Javelin, which Javelin was to sell on to the USSC. (*Id.* at 15). A ratable shipment schedule meant deliveries of approximately 25,000 tons per month, or approximately 150,000 tons by March 31, 2019. (*See* Dkt. No. 39-4, at 2).

To facilitate the shipments and delivery of coal, the Confirmation bound Javelin to make a prepayment of four million U.S. dollar ($4,000,000.00) (the "Prepayment").

    iv.   *The Guaranty*

As a condition for Javelin's agreeing to enter into the Master Agreement and Confirmation and make the $4 million Prepayment, Javelin required a guaranty. (*See* Dkt. No. 39-1, at 2). Accordingly, defendant Booth entered into the Guaranty, dated September 7, 2018, in favor of and for the benefit of Javelin, with the acknowledgement that as an "indirect owner" of Cambrian, he would "derive substantial direct and indirect benefits from the [Master Agreement and Confirmation] and the Prepayment." (*Id.* at 2). Specifically, he guaranteed Cambrian's obligations as follows:

> Guarantor [Booth] hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary [Javelin], as a primary obligor and not merely as surety, all the obligations of Obligor [Cambrian] with respect to [the Master Agreement and Confirmation] (including but not limited to the due and prompt repayment by Obligor of the Prepayment, together with any interest due thereon), in accordance with the terms of the Underlying Agreement in the event of any failure whatsoever or howsoever arising by Obligor to perform its obligations (including but not limited to the obligation to repay the Prepayment) in accordance with the terms of the Underlying Agreement (the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder up to a maximum amount of four million U.S. dollars ($4,000,000.00), plus any interest

4

due but not paid (including default interest) in connection with the Prepayment (the "Maximum Liability").

(*Id.* at 2).

The Guaranty expressly references the Master Agreement and the Confirmation as the "Underlying Agreement." It does not mention the Marketing Agreement.

Booth also "irrevocably waive[d] any defenses to enforcement he may [have] had (now or in the future)" including ". . . any rescission, waiver, release, assignment, amendment or other modification of the Underlying Agreement;" "Any taking, exchange, substitution, release, impairment, amendment, waiver, modification, or non-perfection of any collateral or any other guaranty for the Obligations," and "The existence of any claim, set-off, counterclaim, recoupment or other rights that [Booth or Cambrian] may have against [Javelin] (other than a defense of payment or performance) whether in connection with the Obligations, the Underling Agreement or any other transaction." (*Id.* at 3).

Defendant Booth testifies by declaration that, aside from executing the Guaranty, he was not involved in the preparation or negotiation of any of the other agreements, including the Master Agreement, Confirmation, Marketing Agreement or Letter Agreement. (Dkt. No. 48, at ¶¶4, 7). He likewise attests he was not involved in any coal transactions with Javelin; and he attests that he did not receive any documents or information regarding coal shipments, payments or Cambrian's obligations or debts under the various agreements after signing the Guaranty. (*Id.* at ¶6).

### C. The Confirmation is Terminated

On March 20, 2019, Javelin, Clintwood, and Premier Elkhorn entered into a Letter Agreement terminating and cancelling the September 7, 2018 Confirmation (the "Letter Agreement"). (*See* Dkt. No. 39-4). Javelin's director attests by declaration that "Javelin and Cambrian" entered into the Letter Agreement (Dkt. No. 39, ¶13) but the Letter Agreement on its

5

face is not executed or acknowledged by any representative of Cambrian – only by representatives of Javelin, Clintwood, and Premier Elkhorn. (*See* Dkt. No. 39-4).

The Letter Agreement states that, despite Cambrian's obligation (undertaken by its affiliate Clintwood) to sell and deliver 179,458 short tons of coal to Javelin between May 1, 1018 and March 31, 2019, only 47,850.73 tons had been delivered as of March 20, 2019. (*Id.* at 2). Accordingly, Javelin, Clintwood, and Premier Elkhorn agreed to terminate and cancel the Confirmation.

The Letter Agreement further provides that Cambrian owed "Javelin . . . a refund of the Prepayment Balance." It calculated the outstanding balance of Javelin's Prepayment as $2,439,019.95, with interest "in accordance with the [Master Agreement and Confirmation]." (*Id.* at 3). The Letter Agreement further states that "Javelin . . . hereby makes formal demand for payment of [US$2,439,019.95]." (*Id.*) (alterations in original).

Finally, the Letter Agreement also states that Cambrian owed Javelin an addition $292,168.14 in "marketing fees," and notes that the "Marketing Agreement between Javelin and Cambrian remains valid and binding . . . " (*Id.* at 3-4).

### D. Defendant Resigns from Cambrian

Defendant explains that, in 2019, Cambrian faced financial challenges and decided to enter Chapter 11 bankruptcy. (Dkt. No. 48, ¶8). At or around that time, Defendant – who disagreed with Cambrian's president about whether Cambrian should enter bankruptcy – resigned from Cambrian and relinquished all his ownership interests in Cambrian and its affiliates. (*Id.*). Defendant does not specify when in 2019 he resigned, or whether it was before or after the Letter Agreement terminating the Confirmation was entered. However, Defendant claims that, due to his resignation he has "no ability, or right, to access any documents or information relevant to the agreements and transactions between Javelin, Cambrian Coal, and Clintwood . . . " (Opp. at 7). He testifies that he

6

has never seen any documents or information that establish "the nature and specifics of any defaults by Cambrian Coal under the Master Coal Purchase Agreement and/or the Confirmation" or any amount due and owing as a result. (*Id.* at 8; *see* Dkt. No. 48, ¶¶6, 11-12).

### E. Demand

On November 1, 2019, Javelin sent Booth a demand letter under the Guaranty for full payment of the money Cambrian allegedly owed Javelin. (Dkt. No. 39-5). Javelin stated in the demand letter that Cambrian owed Javelin "US $2,951,246" as of October 31, 2019. (*Id.*).

Neither Cambrian nor the Defendant has made any payment to Javelin of the amounts allegedly due and owing. (Pl.'s Rule 56.1 ¶¶18-19). The amounts that allegedly remain due – and which Javelin seeks now to recover from Defendant – include not only the Prepayment balance with interest, but also "marketing fees" and interest on those fees. (*See* Dkt. No. 39-6).

### F. Plaintiff's Suit

On September 15, 2020, Plaintiff filed the complaint and Defendant was served on September 24, 2020. (Dkt. No. 6). Defendant did not timely answer the complaint, although he requested several extensions of time to answer. (*See* Dkt. Nos. 8, 11). On April 6, 2021, this Court ordered Defendant to answer the complaint "at once" – which Defendant ignored. (Dkt. No. 14).

On July 20, 2021, Plaintiff moved for an entry of default against Defendant. (Dkt. No. 15). On October 19, 2021, Defendant finally answered the complaint and moved to vacate the certificate of default. (Dkt. Nos. 25, 26). The Court issued an order explaining that the Court was prepared to accept Defendant's belated appearance only if Defendant paid Plaintiff's costs for its motion for default judgment. (Dkt. No. 29). Defendant paid those costs. (Dkt. No. 33).

Thereafter, Plaintiff moved for summary judgment. Plaintiff seeks an award of damages in the amount of $3,281,487.91, consisting of a Pre-Payment Balance due of $2,948,798.54 and marketing fees of $332,689.37, inclusive of interest, plus costs and attorneys' fees.

7

**STANDARD**

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir. 2001).

"[P]re-discovery summary judgment is the exception rather than the rule and will be granted only in the clearest of cases." *KJY Inv. LLC v. Noblesse Nail & Spa, Inc.*, No. 20-CV-9116 (KMK), 2021 WL 4429506, at *1 (S.D.N.Y. Sept. 27, 2021) (citing *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 359-60 (S.D.N.Y. 2002)). "[A] pre-discovery motion for summary judgment . . . should be granted only in the rarest cases because the nonmoving party must have had the opportunity to discover information that is essential to [their] opposition to the motion for summary judgment." *Baskett v. Autonomous Research LLP*, No. 17-

CV-9237, 2018 WL 4757962, at *4 (S.D.N.Y. Sept. 28, 2018).

## DISCUSSION

Under New York law, to establish a prima facie case on a written guaranty, "'the creditor need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee.'" *HSH Nordbank AG N.Y. Branch v. Street*, 421 Fed.Appx. 70, 73 (2d Cir. 2011) (summary order) (quoting *Kensington House Co. v. Oram*, 293 A.D.2d 304, 739 N.Y.S.2d 572, 572 (App. Div. 1st Dep't 2002)).

Defendant does not dispute the validity of the Guaranty or that he has paid nothing in response to Plaintiff's demand for payment. (*See* Dkt. No. 45 at ¶19). Defendant instead contests the existence and amount of the underlying debt. (*See id.* at ¶¶21-28). Defendant's argument is two-fold: (1) Plaintiff has failed to carry its burden of establishing the existence and amount of an underlying debt by admissible evidence; and (2) there are material issues of fact regarding the amount due and owing. (*See* Opp. 9, 12).

The Court agrees with Defendants that this is not that rare case where pre-discovery summary judgment is warranted.

First, the Plaintiff has failed to carry its burden of establishing the existence and amount of an underlying debt by admissible evidence. To establish the existence and amount of the debt, Javelin provides the Letter Agreement terminating the Confirmation, the Declaration of Spencer B. Sloan, the Director of Javelin Global Commodities, and a "Statement of Account." The Defendant challenges -- and the Court addresses -- each of these in turn.

The Letter Agreement on its face terminates the Confirmation in light of Cambrian's alleged breach and sets forth debts Cambrian allegedly owes Javelin under the Master Agreement, Confirmation and Marketing Agreement. However, the Letter Agreement is not acknowledged or

9

executed by any representative of Cambrian. Defendant argues that neither Clintwood nor Premier Elkhorn had authority to unilaterally bind Cambrian to the terms and conditions in the Letter Agreement. Defendant also argues that the breach and debt amount that Cambrian allegedly agreed to in the Letter Agreement are not proven by the Letter Agreement alone.

Plaintiff replies and argues that Cambrian affiliates Clintwood and Premier Elkhorn had the power to bind Cambrian because the Master Agreement provides that Cambrian "irrevocably granted to each Approved Seller [Clintwood and Premier Elkhorn] all necessary power and authority to bound Counterparty." However, on its face, the Master Agreement only sets forth that authority in the context of entering a binding *Confirmation* – not in entering an agreement terminating the Confirmation or committing Cambrian to certain debts. It is not clear on the face of either the Master Agreement or Confirmation that either Clintwood or Premier Elkhorn had authority to act on behalf of Cambrian to terminate a Confirmation, admit a breach or bind Cambrian to pay disputed debts as set forth in the Letter Agreement. The Letter Agreement alone does not establish what Cambrian owes Javelin – if anything – such that Booth has an obligation under the Guaranty to pay those amounts.

Plaintiff's next piece of evidence – the declaration of Javelin's Director – does not provide more clarity on the breach or debts owed. Rather, the Director attests that "Javelin and Cambrian entered into a letter agreement" in which he states generally that "Cambrian acknowledged the then-outstanding balance owing by Cambrian" (Dkt. No. 39, ¶¶13-14) and attaches that agreement. However, the Director does not explain why he believes Cambrian is a party to the Letter Agreement or is bound by it, the circumstances or negotiations of that agreement, and why no representative from Cambrian signed the agreement. The Director does not claim to have been privy to any of the negotiations around the Letter Agreement – indeed, a different person, the CEO

of Javelin, executed the Letter Agreement on behalf of Javelin. Defendant points out that the affiant's "mere conclusory statements" fail to "establish facts" or even "show that the affiant . . . is competent to testify on the matters stated." (Opp. at 11 (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)). He claims the declaration is insufficient to support a pre-discovery finding as a matter of law as to the breach and liability. The Court agrees with Defendant.

For Plaintiff's final piece of evidence, the Director of Javelin attaches a document which he declares is "a complete statement of account showing the amounts Javelin advanced to Cambrian under the Master Agreement and Confirmation and all payments Javelin received on account of the amounts advanced." (Dkt. No. 39, ¶19). Yet, Defendant points out that the account statement is "devoid of any details and there is no indication who prepared it, how the summary was compiled, from where the underlying data for the summary originated, and how the specific calculations were made." (Opp. at 12). Accordingly, the Defendant argues the document lacks a proper foundation to be used in support of summary judgment. *See* Fed. R. Civ. P. 56(e); *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."). The Court agrees. The purported "Statement of Account" does not on its face resemble any sort of business record – it could just as easily be a typed summary prepared for the purpose of this litigation – and as Defendant points out, Plaintiffs give no detail or indication about the document's origin, preparation, or underlying data. As such, it lacks a proper foundation and is inadmissible to establish the debt.

Javelin provides no other evidence to establish the underlying debt and Defendant vigorously contests the existence of the debt and amounts due and owing. For example, Defendant points out that there is nothing in evidence from Cambrian acknowledging a breach or a debt and

nothing indicating whether Cambrian has made any payment toward the debt – which would of course impact the amount of his own obligations under the Guaranty. Defendant argues correctly that without discovery, he has been deprived of any opportunity to investigate the purported breach and Prepayment balance that Javelin alleges to be due and owing. Plaintiff has not carried the burden on this motion of establishing by admissible evidence the debt and debt amount.

Further, Defendant argues that he never guaranteed any obligations of Cambrian under the "Marketing Agreement," and thus has no obligation to pay any "Marketing fees." Defendant is correct that the Guaranty – on its face – does not obligate him to pay any fees that would become due and owing under the separate Marketing Agreement. The Guaranty only guarantees up to $4 million of Cambrian's obligations under the Master Agreement and Confirmation. Plaintiff predictably maintains that – contrary to the plain language of the Guaranty – that Defendant owes "Marketing Fees" under the Marketing Agreement because both the Master Agreement and the Marketing Agreement expressly "form[] part of a single, unified underlying business relationship among the Parties." (Dkt. No. 49, at 7). Plaintiff argues that because the "Marketing Agreement and Master Agreement are mutually dependent on each other and form a part of the same transaction," Booth has guaranteed payment of the unpaid $307,525.77 in Marketing Fees. However, given the Guaranty's silence about the Marketing Agreement – which, while part of the overall deal between Cambrian and Javelin, is still a separate agreement – that is far from apparent.

Plaintiff's summary judgment motion is, therefore, premature. It is denied without prejudice.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment is DENIED without prejudice.

Because of the inordinate delay in the prosecution of this lawsuit occasioned by Booth's longstanding failure to appear, the court is not prepared to tolerate any further delay. Booth has until June 17, 2022, to file any discovery requests he wishes to file – including noticing depositions and requesting documents from both Javelin and Cambrian. He is aware of who the principals are at Cambrian and so knows whose deposition to notice. There will be no extension of this deadline: all of Booth's discovery requests must be served on counsel for Plaintiff and filed on ECF by the close of business on June 17, or he will be precluded from taking discovery.

All discovery in this case must be concluded by September 16, 2022. I do not imagine that Javelin really needs discovery; it has the guaranty; it knows the identity of the guarantor; and it has whatever evidence it has in its books and records to justify the debt.

I would not be surprised to see a renewed motion for summary judgment, with admissible evidence, once discovery closes. It must be filed by October 14, 2022. Given the specificity of the Guaranty and the fact that Booth does not deny signing it, I am not going to require the filing of a Joint Pre-Trial Order if such a motion is made.

This constitutes the decision and order of the Court. It is a written opinion.

The Clerk of Court is respectfully directed to terminate the motion at docket number 38.

Dated: May 2, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL