UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

JAVELIN GLOBAL COMMODITIES (UK) LTD.,

        Plaintiff,

-against-

JAMES BOOTH,

        Defendant.

-----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/6/2023

20 civ 7550 (CM)

## DECISION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

After completing a modicum of discovery, Plaintiff has renewed its motion for summary judgment on the guaranty signed by Defendant James Booth in connection with a commercial transaction in coal. Defendant raises no defense to his liability on this absolute and unconditional guaranty, but quibbles with the amount he owes. Plaintiff has accepted Defendant's criticism of its calculations (aside from its calculation of interest owed, which is a technical matter) and has reduced the amount of principal owed to the number that Defendant does not dispute. There is, therefore, no genuine issue of material fact to try; Plaintiff's motion for summary judgment is granted.

## FACTUAL BACKGROUND

The court previously denied a premature motion for summary judgment made by Plaintiff, without prejudice to renewal. (Dkt No. 50). The motion presently before the court is the renewed motion. Much of what will follow by way of background information is taken from the original decision on the motion for summary judgment. However, I have updated the citations to conform to the Statements of Material Facts filed by the parties in connection with this renewed motion.

**Parties and Relevant Non-Parties**

Plaintiff Javelin is a United Kingdom Limited Liability company organized under the laws of England and Wales with a place of business in London. (Dkt. No. 66 ("Pl.'s Rule 56.1") ¶ 1). Javelin's business includes the sale and marketing of commodities, including coal. (*Id.*, ¶ 2).

Defendant Booth is an individual citizen and resident of Kentucky. (Compl. ¶2). Booth was a member and officer of non-party Cambrian Coal LLC ("Cambrian"), a Kentucky Limited Liability company engaged in the mining of coal. (Pl.'s Rule 56.1, ¶ 3).

Non-parties Clintwood Elkhorn Mining LLC ("Clintwood") and Premier Elkhorn Coal LLC ("Premier Elkhorn") are affiliates of Cambrian.

### A. The Underlying Agreements and Guaranty

i. *The Master Coal Purchase and Sale Agreement*

In 2018, Javelin and Cambrian entered into a "Master Coal Purchase and Sale Agreement" dated September 7, 2018 ("Master Agreement"). (*See* Pl.'s Rule 56.1, ¶ 4). The Master Agreement set forth terms for transactions between Javelin and Cambrian for the shipment, purchase and sale of coal. (*See* Dkt. No. 63-1).

Cambrian was authorized under the Master Agreement to "designate any of its Affiliates," including specifically Clintwood and Premier Elkhorn, "as the Seller under any Confirmation."

(*Id.* at § 23.1). And Clintwood and Premier Elkhorn, affiliates of Cambrian, were each listed as "Approved Sellers" under the Master Agreement. (*Id.* at Annex 2). Per the terms of the Master Agreement, Cambrian agreed that, whenever an Approved Seller executed a Confirmation, Cambrian would be "bound by the terms of such Confirmation and hereby irrevocably grants to each Approved Seller all necessary power and authority to bound Counterparty" and that "no such designation [of Approved Sellers] by [Cambrian] shall relieve [Cambrian] of its obligations [under the Master Agreement] with respect to such Confirmation." (*Id.* at § 23.1).

    ii.   *The Marketing Agreement*

The Master Agreement references Javelin's and Cambrian's entering into a separate "Marketing Agreement." Specifically, the Master Agreement states, "The Parties are entering into this Master Agreement concurrently with the Marketing Agreement (as hereinafter defined), the two agreements being complimentary of, and mutually dependent on one another, each forming part of a single, unified underlying business relationship among the Parties." (*Id.* at 3). The Marketing Agreement contains the same general language that the agreements are complimentary, mutually dependent, and form part of a single underlying business relationship among the parties. (*See* Dkt. No. 48-1).

    iii.   *The Confirmation*

Pursuant to the Master Agreement, Javelin and Cambrian entered into a purchase and sale confirmation, reference number CLI18(TP)0004 (the "Confirmation"), dated September 7, 2018. (*See* Dkt. No. 63-2). Cambrian's affiliate Clintwood was the designated Seller under this Confirmation.

The Confirmation set forth the terms for a specific "Onward Sale" transaction. (*Id.* at 8). The Confirmation explains that Javelin had entered into a separate contract with the non-party

United States Steel Corporation ("USSC") for the sale and purchase of coal produced by Clintwood or its affiliates. (*Id.* at 2). Javelin entered into the contract with USSC "for the purposes of intermediating the supply of coal." (*Id.*). Clintwood, as an authorized seller for Cambrian, agreed to supply coal to Javelin "in order to fulfil" the terms of Javelin's contract with USSC.

The Confirmation referenced and incorporated the "Customer Contract" between Javelin and USSC for many of the "Principle [sic] Terms" of the product shipment and delivery. (*Id.* at 2-3; *see id.* at 14). Specifically, the Confirmation and Customer Contract set forth that, between May 1, 2018 and March 31, 2019, Clintwood was to sell and deliver 179,458 short tons of coal ratably to Javelin, which Javelin was to sell on to USSC. (*Id.* at 15). A ratable shipment schedule meant deliveries of approximately 25,000 tons per month, or approximately 150,000 tons by March 31, 2019. (*See* Dkt. No. 63-4, at 2).

To facilitate the shipments and delivery of coal, the Confirmation bound Javelin to make a prepayment of four million U.S. dollars ($4,000,000.00) (the "Prepayment"). In accordance with the Confirmation, Javelin was to recoup the Prepayment through credits of $270,00 each, in respect of each shipment of coal under the Confirmation, until the Prepayment was repaid in full. (Dkt. No. 66, ¶¶ 9-10). The balance of the prepayment bore daily interest at the rate of LIBOR plus 6.5% per anum (based on a 360 day year) through the date when the Prepayment was recouped in full. Upon the occurrence and during the continuance of any default, the balance of the Prepayment bore daily interest at the rate of LIBOR plus 8% per annum, again through the date when the Prepayment was fully recouped. (Dkt. No. 66, ¶ 11).

    iv.   *The Guaranty*

As a condition for Javelin's agreeing to enter into the Master Agreement and Confirmation and make the $4 million Prepayment, Javelin required a guaranty. (*See* Dkt. No. 66, ¶ 12).

Accordingly, defendant Booth entered into the Guaranty, dated September 7, 2018, in favor of and for the benefit of Javelin, with the acknowledgement that as an "indirect owner" of Cambrian, he would "derive substantial direct and indirect benefits from the [Master Agreement and Confirmation] and the Prepayment." Specifically, he guaranteed Cambrian's obligations as follows:

> Guarantor [Booth] hereby absolutely, unconditionally and irrevocably guarantees to Beneficiary [Javelin], as a primary obligor and not merely as surety, all the obligations of Obligor [Cambrian] with respect to [the Master Agreement and Confirmation] (including but not limited to the due and prompt repayment by Obligor of the Prepayment, together with any interest due thereon), in accordance with the terms of the Underlying Agreement in the event of any failure whatsoever or howsoever arising by Obligor to perform its obligations (including but not limited to the obligation to repay the Prepayment) in accordance with the terms of the Underlying Agreement (the "Obligations"), plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder up to a maximum amount of four million U.S. dollars ($4,000,000.00), plus any interest due but not paid (including default interest) in connection with the Prepayment (the "Maximum Liability").

(Dkt. No. 63-3, at 2).

The Guaranty expressly references the Master Agreement and the Confirmation as the "Underlying Agreement." It does not mention any Marketing Agreement.

Booth also "irrevocably waive[d] any defenses to enforcement he may [have] had (now or in the future)" including ". . . any rescission, waiver, release, assignment, amendment or other modification of the Underlying Agreement;" "Any taking, exchange, substitution, release, impairment, amendment, waiver, modification, or non-perfection of any collateral or any other guaranty for the Obligations," and "The existence of any claim, set-off, counterclaim, recoupment or other rights that [Booth or Cambrian] may have against [Javelin] (other than a defense of payment or performance) whether in connection with the Obligations, the Underling Agreement or any other transaction." (*Id.* at 3).

In connection with the original motion for summary judgment, Defendant Booth testified by declaration that, aside from executing the Guaranty, he was not involved in the preparation or negotiation of any of the other agreements, including the Master Agreement, Confirmation, Marketing Agreement or Letter Agreement. (Dkt. No. 48, ¶¶ 4, 7). He likewise attests he was not involved in any coal transactions with Javelin; and he attests that he did not receive any documents or information regarding coal shipments, payments or Cambrian's obligations or debts under the various agreements after signing the Guaranty. (*Id.*, ¶ 6). Those facts are not material to the determination of the motion.

After the guaranty was signed, on September 11, 2018, Javelin wired the $4 million prepayent to Clintwood. (Dkt. No. 66, ¶ 14).

**First Train Prepay Discount**

On September 14, 2018, Clintwood made a 100-car rail shipment pursuant to the terms of the Confirmation (the "First Train") and invoiced Javelin therefor on September 13, 2018. (See Morris Decl., ¶ 9 & Ex. E). As shown on Invoice #091318, Clintwood shipped and Javelin accepted 10,869.30 tons of coal at a price of $124.78 per ton, for an invoice total of $1,356,271.25. As further shown on Invoice #091318, the amount due from Javelin under Invoice #091318 totaled $1,071,550.91 – the $1,356,271.25 sale price less (i) a $14,720.35 financing charge and (ii) the $270,000 Prepay Discount. In accordance with the "Payment Terms" under the Confirmation, Javelin owed Clintwood a provisional payment of 75% of the invoice total, or $1,017,203.44, on September 18, 2018. (*See* Foster Decl., Ex. A at 4). Javelin owed Clintwood final payment of the $54,347.47 balance (25% of the invoice total, or $339,067.81, less the financing charge and application of the Prepay Discount) on November 16, 2018. (*See* Morris Decl., Ex. E).

On September 18, 2018, Javelin wired Clintwood the provisional payment of $1,017,203.44 due on Invoice #091318. (*See* Dkt. No. 74, ¶ 10). On November 16, 2018, Javelin wired Cambrian the balance due under Invoice #091318. (*Id.*, ¶ 11).

**Second Train Prepay Discount**

On November 6, 2018, Clintwood invoiced Javelin for a second 100-car railcar shipment of coal on November 5, 2018 (the "Second Train"). (Dkt. No. 66, ¶ 19; Dkt. No. 74, ¶ 12 & Ex. H). As shown on Invoice #110618, Clintwood shipped and Javelin accepted 10,733.28 tons of coal at a rate of $124.78 per ton, for an invoice total of $1,339,298.68. As further shown on Invoice #110618, the total amount due from Javelin under Invoice #110618 was $1,051,894.49, reflecting deduction of the $270,000 Prepay Discount and a $17,404.19 financing charge. Per the Confirmation and Invoice #110618, Javelin owed Cambrian a provisional payment of 75% of the total invoice amount, or $1,004,474.01, on November 8, 2018; Javelin owed Cambrian the balance of $47,420.48, reflecting 25% of the total amount, less the finance charge and Prepay Discount, on January 16, 2019.

On November 7, 2018, Javelin wired Clintwood the $1,004,474.01 provisional payment due on Invoice #110618. (Dkt. No. 74, ¶ 13). On January 24, 2019, Javelin wired Clintwood the balance due under Invoice #110618. *(Id.,* ¶ 14).

**Third Train Prepay Discount**

On December 29, 2018, Clintwood invoiced Javelin for a 121-car shipment of coal (the "Third Train"). (Dkt. No. 66, ¶ 21 and Dkt. No. 74, ¶ 15 & Ex. K). The invoice shows that, on December 29, 2018, Clintwood shipped and Javelin accepted 13,170.40 tons of coal at a price of $124.78, for an invoice total of $1,643,402.51. As further shown on the invoice, the amount due from Javelin on Invoice #122918 was $1,358,739.94, reflecting deduction of the

$270,000 Prepay Discount and a $14,662.57 financing charge. In accordance with the invoice and the Confirmation, Javelin owed Clintwood a provisional payment of 75% of the invoice total, or $1,232,551.88, on January 1, 2019. Javelin owed Clintwood final payment of the balance of $126,849.84, (originally invoiced at $126,188.05, based on an estimated LIBOR rate), 25% of the total invoice amount, or $410,850.63, less the financing charge and Prepay Discount, on February 16, 2019.

On January 3, 2019, Javelin wired Clintwood the $1,232,551.88 provisional payment due under Invoice #122918. (Dkt. No. 74, ¶ 16).

Because Clintwood ceased shipping coal to Javelin pursuant to the Confirmation prior to February 16, 2019, and the parties began taking steps to terminate their relationship, Javelin did not pay the balance of $126,849.84 (originally invoiced at $126,188.05, based on an estimated LIBOR rate), due under Invoice #122918. (*Id.*, ¶ 17).

**Fourth Train Prepay Discount**

On January 25, 2019, Clintwood invoiced Javelin for its final, 121-car shipment of coal (the "Fourth Train") under the Confirmation. (*See* Morris Decl., ¶ 18 & Ex. M). As shown on the invoice, Clintwood shipped and Javelin accepted 13,077.75 tons of coal at a rate of $124.78, for an invoice total of $1,631,841.64. As shown on the invoice, the amount due from Javelin totaled only $1,080,038.95, as the parties had agreed to apply two Prepay Discounts to this train, one to each payment, as well as $11,802.69 in financing charges. In accordance with the Confirmation and Invoice #012519, a provisional payment of 75% of the invoice total ($1,223,881.23), less a Prepay Discount, or $953,881.23, was due on January 27, 2019. Javelin owed Clintwood final payment of the balance of $126,692.91 (originally invoiced at $126,157.72, based on an estimated

LIBOR rate), $407,960, or 25% of invoice total, less financing and Prepay Discount, on March 16, 2019.

On January 29, 2019, Javelin wired Clintwood the $953,881.23 provisional payment. (*See* Morris Decl., ¶ 19). Once again, Javelin did not pay Clintwood the balance of $126,692.91 (originally invoiced at $126,157.72, based on an estimated LIBOR rate), due under Invoice #012519 and, accordingly, did not benefit from the previously agreed upon second Prepay Discount for the Fourth Train. (*See* Morris Decl., ¶ 20).

**The Parties End Their Relationship**

Beginning in February 2019, Clintwood ceased shipments of coal pursuant to the Confirmation and the Master Agreement. (*See* Morris Decl., ¶ 21). Clintwood issued no further invoices to Javelin, and Javelin made no further payments to Clintwood. (*Id.*).

By Letter Agreement dated March 20, 2019, Javelin, Clintwood Elkhorn, and Premier agreed to terminate their coal supply agreements under the Confirmation and the Master Agreement and negotiate a repayment schedule for the then remaining balance of the Prepayment over a period of time. (*See* Foster Decl., ¶ 15 & Ex. D).

On May 4, 2019, the negotiation period under the Letter Agreement expired without an agreement, and Clintwood Elkhorn and Cambrian went into default on their obligations with respect to the Prepayment under the Confirmation and Master Agreement. (*See* Foster Decl., ¶ 16).

On November 1, 2019, Javelin issued a demand for payment with respect to the unpaid obligations of Cambrian under the Master Agreement and Confirmation to Mr. Booth under the Guaranty. (*See* Foster Decl., ¶ 17 & Ex. E).

On January 30, 2019, Clintwood affiliate Premier Elkhorn Coal, LLC ("Premier"), another Approved Seller under the Master Agreement, invoiced Javelin for coal storage services for the month of January 2019 in the amount of $75,444. (*See* Morris Decl., ¶ 22).

Javelin did not pay this invoice. (*See* Morris Decl., ¶ 23).

On February 12, 2019, Premier invoiced Javelin for coal storage services for the month of February 2019 in the amount of $55,872. (*See* Morris Decl., ¶ 24).

Javelin did not pay this invoice either.

This brought the total that Javelin owes Premier to $131,316. (*See* Morris Decl., ¶ 25).

Javelin did not receive any other invoices from Cambrian Coal, Clintwood Elkhorn, Premier, or Perry County Coal, LLC under or with respect to the Master Agreement or the Confirmation. (*See* Morris Decl., ¶ 26).

**Total Remaining Balance Due Under the Master Agreement and Confirmation**

Javelin benefitted from five $270,000 Prepay Discounts with respect to amounts due to Clintwood Elkhorn, reducing the remaining balance of Javelin's $4,000,000 Prepayment amount by $1,350,000, bringing the prepayment balance owed by Clintwood to Javelin to $2,650,000. (*See* Dkt. No. 74, Amended Morris Decl., ¶ 27).

Javelin has reduced that amount by the amounts due to Clintwood by Javelin as a result of Javelin's non-payment with respect to the balances on Trains 3 and 4. (*See* Morris Decl., ¶ 28). As set forth above, those balances, as shown on Clintwood's invoices, totaled $126,188.05 and $126,157.72, respectively. (*See supra*, ¶¶ 23, 26). With the relevant adjustments to the LIBOR rates shown on those invoices, Javelin owed Clintwood $126,849.84 and $126,692.91,

respectively. Crediting those amounts brings the prepayment balance owed by Clintwood to Javelin to $2,396,947.14. (*Id.*, ¶ 28).[1]

Cambrian is jointly and severally liable for the amounts owing by Clintwood to Javelin under the Confirmation and Master Agreement. (*See* Foster Decl., ¶ 7 & Ex. A, p. 25 at § 23.1).

Javelin has further reduced the prepayment balance for the amounts due and owning by Javelin to Premier with respect to Premier Invoices #013019 and #021219, totaling $131,316. Crediting that amount to the amounts owing to Cambrian under the Master Agreement and the Confirmation brings the balance owed by Cambrian to Javelin to $2,265,631.14, excluding interest. (*See* Dkt. No. 74, Amended Morris Decl., ¶¶ 30-31). Together with interest, including interest at the default rate under the Confirmation, on account of the outstanding balance, Cambrian remains obligated to Javelin in the amount of $4,166,068 as of the date hereof. (*Id.*, ¶ 32).

Javelin has received no payment from Cambrian (or any other party) with respect to that remaining prepayment balance or otherwise. (*Id.*, ¶ 33). Javelin also has not received any payment from Booth under the Guaranty.

### B. Demand

On November 1, 2019, Javelin sent Booth a demand letter under the Guaranty for full payment of the money Cambrian allegedly owed Javelin. (Dkt. No. 63 Ex. 5). Javelin stated in the demand letter that Cambrian owed Javelin "US $2,951,246" as of October 31, 2019. (*Id.*).

---

[1] This does not appear to include any sums incurred pursuant to the Marketing Agreement, as to which the Guaranty by its express terms does not extend. While the original motion for summary judgment sought judgment for amounts due under the Marketing Agreement, that aspect of the motion appears to have been dropped by Javelin.

### C. Plaintiff's Suit

On September 15, 2020, Plaintiff filed the complaint and Defendant was served on September 24, 2020. (Dkt. No. 6). Defendant did not timely answer the complaint, although he requested several extensions of time to answer. (*See* Dkt. Nos. 8, 11). On April 6, 2021, this Court ordered Defendant to answer the complaint "at once" – which Defendant ignored. (Dkt. No. 14).

On July 20, 2021, Plaintiff moved for an entry of default against Defendant. (Dkt. No. 15). On October 19, 2021, Defendant finally answered the complaint and moved to vacate the certificate of default. (Dkt. Nos. 25, 26). The Court issued an order explaining that the Court was prepared to accept Defendant's belated appearance only if Defendant paid Plaintiff's costs for its motion for default judgment. (Dkt. No. 29). Defendant paid those costs. (Dkt. No. 33).

Thereafter, Plaintiff moved for summary judgment, seeking an award of damages in the amount of $3,281,487.91, consisting of a Pre-Payment Balance due of $2,948,798.54 and marketing fees of $332,689.37, inclusive of interest, plus costs and attorneys' fees. (Dkt. No. 38).

Defendant responded to the motion by explaining that he had left Cambrian in 2019, following a disagreement with the latter's President about Cambrian's decision to enter Chapter 11 bankruptcy. (Dkt. No. 48, ¶ 8). He claimed that, due to his resignation, he has "no ability, or right, to access any documents or information relevant to the agreements and transactions between Javelin, Cambrian Coal, and Clintwood . . . " and testified that he had never seen any documents or information that establish "the nature and specifics of any defaults by Cambrian Coal under the Master Coal Purchase Agreement and/or the Confirmation" or any amount due and owing as a result. (*Id.* at 8; *see* Dkt. No. 48, ¶¶ 6, 11-12).

The court denied the pre-discovery summary judgment motion without prejudice on the ground that it was premature and gave Defendant the opportunity to take discovery about the matters to which he no longer had access.

**Standards for Summary Judgment**

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001).

**I.      There Is No Genuine Issue of Fact as to Booth's Liability on the Guaranty**

Booth does not deny that he is liable on the guaranty. There is, therefore, no issue to try; liability is conceded.

"In an action based on notes and guarant[ees], a plaintiff establishes its prima facie entitlement to summary judgment by establishing the execution of the agreements at issue and nonpayment thereunder." *United States v. Ceana, Inc.*, 422 F. Supp. 3d 678, 681 (E.D.N.Y. 2016); *Orix Credit Alliance, Inc. v. Bell Realty, Inc.*, No. 93-cv-4949, 1995 WL 505891, at *3

(S.D.N.Y. Aug. 23, 1995).

The record on this motion demonstrates the existence of unconditional guarantee, underlying debt and guarantor's failure to pay. To defeat a properly supported summary judgment motion, the non-movant must offer evidence setting forth some defense to payment. None is proffered.

The Foster Declaration and the Amended Morris Declaration, together with the exhibits attached thereto establish that (1) Defendant executed a written guaranty absolutely, unconditionally and irrevocably guaranteeing Cambrian's debts to Javelin under the Underlying Agreement (Master Agreement and Confirmation); (2) Cambrian failed to pay its debts to Javelin; (3) Cambrian's outstanding obligation to Javelin stands at $ 4,265,335.40 as of June 7, 2023; and (4) Booth has also failed to pay this debt.

Booth has no defense to his liability on the guaranty. Once a plaintiff has established a prima facie case of entitlement to recover under a guaranty, the defendant bears the burden of producing "evidentiary facts showing the existence of a triable issue of fact with respect to a bona fide defense." *Indus. Bank of Japan Tr. Co. v. Haseotes,* No. 71063, 1993 WL 322775, at *4 (S.D.N.Y. Aug. 19, 1993); *see also WestRM-W.Risk Markets, Ltd. v. Lumbermens Mut. Cas. Co.,* 314 F. Supp. 2d 229, 232 (S.D.N.Y. 2004)("the party opposing summary judgment may defeat the motion only by asserting defenses that raise genuine issues of material fact"). The Defendant has not satisfied, and cannot satisfy, that burden.

Defendant has asserted no defense to his liability on the Guaranty. Booth admits his execution of the Guaranty and his failure to pay on account of the Guaranty. He offers no evidence to contradict Plaintiff's evidence that Cambrian has failed to pay the underlying debt. And because the guaranty is absolutely and unconditional, once the debt and non-payment are established,

Booth is barred from asserting any defense or offset thereto. See *HSH Nordbank AG New York Branch v. St.,* 421 F. App'x 70, 72–73 (2d Cir. 2011) (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 188 F.3d 31, 35 (2d Cir.1999) ("Absolute and unconditional guaranties . . . preclude guarantors from asserting a broad range of defenses under New York law.").

## II. There is No Genuine Issue of Fact as to the Amount Owed

The only issues raised by the papers submitted by Booth in opposition to the motion for summary judgment relate to the calculation of the amount owed. There is, however, no issue of fact to resolve.

Booth tenders three criticisms of Plaintiff's proof of the amount of the debt.

First, Booth takes issue with the sufficiency of the evidence establishing that Plaintiff made the $1,017,550.91 provisional payment due on Invoice #091418. However, there is no evidentiary insufficiency. Docket No. 74 – the Amended Declaration of Timothy Morris, which includes corrections and material responsive to the criticisms leveled at the original motion papers by Defendant Booth – is perfectly admissible evidence in support of the fact asserted in paragraph 16 of Plaintiff's Rule 56.1 statement. Morris' Declaration is sworn testimony, no different than if he had given it from the witness stand. Sworn testimony is admissible, whether or not it is not backed up with exhibits, unless some rule of evidence bars it from coming in. Booth identifies no rule that bars Morris from testifying about the matters comprehended in his Declarations.

Moreover, in this case, Morris' sworn testimony is backed with exhibits. The screen shot that is offered to buttress Morris' sworn testimony is admissible as a business record of Javelin's. Booth's evidentiary arguments are simply a smokescreen for the fact that he cannot dispute any of the underlying facts.

Second, Defendant argues that Plaintiff failed to account for application of a fifth Prepay Discount in calculating the offset amount. Here, Defendant is correct: Plaintiff agrees that, in his original affidavit, Morris failed to apply the Fifth Prepay Discount to the values provided in Paragraphs 27, 28 and 31. However, the total damages figure submitted by Plaintiff and provided in Paragraph 32 of the First Morris Declaration accurately accounted for application of the Fifth Prepay Discount; and the Amended Morris Declaration corrects the figures in Paragraphs 27, 28 and 31 to reflect application of the Fifth Prepay Discount credit. (*See* Reply. Decl. ¶¶ 27, 28, 31). The various damage figures in Morris' Amended Declaration have been updated in response to Defendant's correct observation. This eliminates any genuine issue of fact.

Third, Defendant argues that Plaintiff has not provided sufficient support for its interest calculation. Again, I disagree. In Plaintiff's original submission, Plaintiff provided details for its calculation of the principal balance, and identified the applicable interest rates. Those rates are derived from the terms of the underlying contracts. (*See* Foster Decl. ¶ 12; Ex. B to Foster Decl. p. 2-3). To deal with Morris' initial failure to apply the Fifth Prepay Discount, Plaintiff has corrected the principal balance calculation in the Amended Morris Declaration. The spreadsheet submitted as Exhibit T to the Amended Morris Declaration provides full details of interest accrual, including default interest. Nothing in Booth's papers suggests that Morris' corrections are themselves erroneous.

There is, therefore, no barrier to granting Plaintiff's motion for summary judgment, as amended to reflect the revised damages calculation.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment for Plaintiff. Plaintiff shall submit a form of judgment that includes interest at the contract rate through the date of submission. From and after the entry of judgment interest shall accrue at the federal judgment rate.

The Clerk of Court is directed to remove the motion at Docket #62 from the court's list of open motions. Once judgment is entered, the case should be closed.

This is a written decision.

Dated: November 6, 2023

*[signature]*
———————————————
U.S.D.J.

BY ECF TO ALL COUNSEL